**George Luis HERMOSILLO**

v.

**The STATE of Texas.**

**No. 2–93–442–CR.**

Court of Appeals of Texas,
Fort Worth.

June 8, 1995.

Ordered Published June 26, 1995.

Discretionary Review Refused Oct. 18, 1995.

---

William S. Harris, Fort Worth, for appellant.

Tim Curry, Crim. Dist. Atty., Betty Marshall, Asst. Chief Appellate Sec., Charles M. Mallin, Asst. Chief Appellate Sec., David M. Curl, Terri Moore, Renee Harris, Asst. Dist. Attys., for appellee.

Before COLLEY, J., and ANNETTE STEWART, J. (Retired) (Sitting by Assignments).

## OPINION

STEWART, Justice (Retired).

A jury sentenced Appellant George Luis Hermosillo to life in prison after convicting him of aggravated robbery. *See* TEX.PENAL CODE ANN. § 29.03 (Vernon 1994). Although he does not challenge the sufficiency of the evidence to support his conviction, he brings four points of error on appeal. We overrule appellant's points of error and affirm the judgment of the trial court.

### FACT SUMMARY

Jerry Romero, a witness for the State, testified that he, appellant, and a man named Jose "Joe" Fernandez engaged in a discussion about robbing a taxicab driver shortly after seeing a television news story about the robbery and murder of a cab driver in late November or early December, 1990. Romero testified that Fernandez brought up the subject again on Christmas Eve, 1990, when he told Romero that he was running low on money and was going to plan a robbery. The subject of robbing a cab driver arose a third time, when Romero went to visit Fernandez at the latter's room at the Fort Worther Motel on December 27, 1990. At that time, Fernandez and appellant indicated they were leaving the motel to carry out their robbery and asked Romero whether he wanted to come along. Romero declined, appellant and Fernandez left the motel, and

Romero learned from the television news that night that a taxicab driver had been shot and killed. Romero also said that he discovered his handgun was missing from his home on the day of the robbery and that Fernandez and appellant said they did not know what happened to the weapon.

Fernandez received a life sentence in return for a guilty plea and his testimony at appellant's trial. He testified that he and appellant planned to call for a taxi from a grocery store known as "Danal's" located near Romero's house so that authorities investigating the holdup would not think it was committed by a guest at the Fort Worther Motel. Fernandez said that he and appellant planned to have the cab driver take them to a College Avenue address where a drug house had once been and that they finally decided to kill the cab driver to prevent him from identifying them. Fernandez also said that he and appellant planned how to divide the proceeds of the robbery.

Fernandez said appellant was armed with a gun stolen from Romero's home and called Yellow Checker Cab after being warned against asking for any of the cab drivers Fernandez knew personally. He said they then wiped their fingerprints off the telephone and waited for the taxi to arrive at Danal's.

When the taxi came to the store, Fernandez got into the back seat behind the driver, and appellant sat in the rear passenger seat. They gave the driver, Lorain Dingman, instructions to drive to College Avenue, and at some point during the ride, appellant gave Fernandez the firearm. During the drive, Fernandez and appellant carried on a conversation in Spanish so that the driver would not understand that they were discussing how to split the proceeds and encouraging each other to complete the robbery.

Fernandez said that appellant told the driver where to stop on College Avenue, that the driver asked the two for the three-dollar fare and that Fernandez shot the driver in the head as the driver reached for his CB radio. Appellant began rifling through the driver's pockets, but Fernandez told him to get into the back seat as Fernandez pushed the driver's body over and drove the car over to a trash dumpster. Fernandez testified that he and appellant took from Dingman between $120 and $140, a silver watch, and a fire extinguisher that had been in the trunk of the cab. Fernandez said appellant encouraged him to shoot Dingman again because the man was still breathing, but Fernandez refused and told appellant to shoot Dingman. Appellant refused to do so.

The two then threw away the fire extinguisher and walked back to the motel, taking back roads because their clothing was stained with blood. Once back at the motel, Fernandez and appellant cleaned up and divided the money in the presence of appellant's sisters, who were told about the robbery. Some time later at a party, appellant mentioned the robbery, which Fernandez initially denied but later admitted. Fernandez gave a statement to police disclosing his and appellant's involvement in the robbery after Fernandez was arrested on an assault charge less than two months after the robbery. Included in Fernandez' confession was the statement that he had sold the gun used in the robbery to a drug dealer so that he would not be caught with the murder weapon.

## POINTS OF ERROR ONE AND TWO

In his first and second points of error, appellant complains that the trial court erred by ruling that the State had given adequate racially neutral explanations in the exercise of two of its peremptory challenges. Appellant argues both points simultaneously.

Following voir dire, the State exercised three peremptory strikes against venirepersons who were members of minority groups, one Hispanic woman and two African-American males. Appellant objected that the State had violated the equal protection clause of the United States Constitution and the Code of Criminal Procedure and requested the court to require the State to provide racially neutral explanations for the challenges. The court responded, "all right." The prosecutor then supplied her explanations.

On appeal, appellant does not challenge the existence of racially neutral reasons for excluding Emma Maldonado, but he does challenge the reasons for the State's exclu-

sion of the two African–Americans, Kemper Cloud, venireperson twenty, and Xavier Sanders, venireperson twenty-five. The prosecutor stated that she struck Kemper Cloud because he indicated that he might be biased in favor of the defendant against the State and the victim and that later she felt like Cloud was "backtracking." She also added that he appeared to be disinterested in the proceedings.

The following exchange between the prosecutor and Cloud occurred during voir dire:

VENIREMAN CLOUD: My name is Kemper Cloud.

[PROSECUTOR]: Okay. Mr. Cloud, what do I need to know about you—

VENIREMAN CLOUD: I'm sorry?

[PROSECUTOR]:—that would help us?

VENIREMAN CLOUD: I'm a fair person. And I believe that a person is innocent until proven guilty.

[PROSECUTOR]: Uh-huh.

VENIREMAN CLOUD: That's just the way that I feel, you know. Weigh the facts out.

[PROSECUTOR]: Okay. Do you think that just because a person is accused of committing a crime that they deserve more of a fair trial than, say, the victim in the case?

VENIREMAN CLOUD: Repeat that again, if you might, please.

[PROSECUTOR]: Do you think that just because a person is accused of committing a crime—he's the one that might go to prison—

VENIREMAN CLOUD: Okay.

[PROSECUTOR]: —for the act.

VENIREMAN CLOUD: All right.

[PROSECUTOR]: Is he entitled to more consideration by the jury or more of a fair trial than the victim of a case?

VENIREMAN CLOUD: I do believe so.

[PROSECUTOR]: You do?

VENIREMAN CLOUD: Yes, ma'am.

[PROSECUTOR]: Okay. You know, the Judge told you that both sides are entitled to the same consideration, and we're not criticizing you for feeling like the defendant might be entitled to a little more.

VENIREMAN CLOUD: Right.

[PROSECUTOR]: But that is how you feel?

VENIREMAN CLOUD: Yes, ma'am. That's the way I feel.

Moments later the prosecutor then asked another juror:

[PROSECUTOR]: And you understand it's not a disgrace to say, like Mr. Cloud did, if he's looking at the penalty I would give him a little more consideration.

[PROSECUTOR]: And you understand it's not a disgrace to say, like Mr. Cloud did, if he's looking at the penalty I would give him a little more consideration.

At this time, Cloud made no effort to dispute the prosecutor's interpretation of his position.

Defense counsel later asked Cloud to explain his answer to the prosecutor's question in light of the explanation by defense counsel about the relative power of the State and the citizen and their ability to investigate and try criminal matters. Cloud stated that he did not mean to imply he would not find someone guilty if the evidence showed it.

Finally, the prosecutor called Cloud before the bench and had the following exchange with him:

[PROSECUTOR]: Mr. Cloud, I want to call up what we were talking about earlier when we were talking about both sides getting the fair trial stuff.

VENIREMAN CLOUD: Yes, ma'am.

[PROSECUTOR]: Now, I want to make sure I understand you correct. When you said you would give the defendant more of a fair trial than the State because he's the one that's facing prison, right?

VENIREMAN CLOUD: Let me kind of restate that.

[PROSECUTOR]: Okay.

VENIREMAN CLOUD: Repeat the question first, and then I go at it again.

[PROSECUTOR]: First of all, if you believed he was guilty and we proved the case you could find him guilty?

VENIREMAN CLOUD: Right, right.

[PROSECUTOR]: Okay. But since he is the one that is looking at the penitentiary—

VENIREMAN CLOUD: Uh-huh.

[PROSECUTOR]: —would you give him more of a fair trial than you would the State of Texas? Would you be biased in his favor?

VENIREMAN CLOUD: Oh, no. No.

[PROSECUTOR]: No?

VENIREMAN CLOUD: No. I wouldn't be biased in his favor, no.

[PROSECUTOR]: Okay. Tell me then what you meant earlier when we were talking and you said you'd give him more?

VENIREMAN CLOUD: Okay. I probably didn't understand the question, you know, fully.

[PROSECUTOR]: Okay.

VENIREMAN CLOUD: That's what I wanted to ask for sure.

[PROSECUTOR]: Well, kind of enlighten me on that.

VENIREMAN CLOUD: When you said I'd give him more, just like I was going in favor of him, you know, that's where I kind of reacted from the questions that you gave me. But I wouldn't be in favor. You'd just have to weigh things out. If he's innocent or guilty just have to, you know, weigh the facts out.

[PROSECUTOR]: Uh-huh.

VENIREMAN CLOUD: That's what I'm saying. So that's the way I look at it.

[PROSECUTOR]: Uh-huh, okay. So if you believed he was guilty you'd find him guilty?

VENIREMAN CLOUD: That's correct.

[PROSECUTOR]: If you didn't believe he was guilty, you'd find him not guilty?

VENIREMAN CLOUD: That's correct.

The State did not ask Xavier Sanders any questions. The prosecutor stated she struck Sanders because his questionnaire indicated that he had been arrested for fleeing from a police officer and because he appeared disinterested. Defense counsel only questioned Sanders about his studies at Tarrant County Junior College. The prosecutor said she was troubled by Sanders' admitted flight from police, particularly since the State planned to offer evidence that appellant had fled from police and that such flight was evidence of appellant's guilt.

The trial court then said: "I find beyond a reasonable doubt that the record supports the statements of the State, as do my observations of the conduct and demeanor of these three members of the venire."

Appellant notes that when the prosecutor first questioned Cloud, she asked who was entitled to a more fair hearing: the accused or the *victim*. Appellant argues that Cloud might have instinctively recognized that a trial is a contest between the accused and the State rather than between the accused and the victim, that the system recognizes this distinction by placing the burden of proof on the State and allowing the accused to stand mute and not answer, and that Cloud's answers were consistent with the logic built into the system, as discussed by the prosecutor before she questioned him individually. Appellant further argues that Cloud made it abundantly clear during later questioning that he did not mean to say he was biased in favor of the accused and that, instead, he was saying he would fairly try the case and give the accused the special considerations afforded him by our system of justice.

As to the exclusion of Sanders, appellant notes that the State chose not to question him about his arrest for fleeing from police, despite the fact that prosecutors could have done so without Sanders' answers being published to the rest of the venire. Appellant argues that, had the State questioned Sanders about his flight, he might have indicated his situation was different from that of appellant's. Additionally, appellant relies on the State's failure to introduce any testimony at the trial that appellant attempted to flee from police investigating the crime. In fact, appellant points out that the arresting officer testified that appellant did not run but did as instructed by the officer and that appellant had previously been to the police station to give a voluntary statement about the case. Appellant contends the State's failure to demonstrate that appellant attempted to flee

proves the State's reason for striking Sanders was a pretext. Finally, appellant argues the fact that Sanders had been charged with a crime could not have been sufficient to strike him from the panel, because a white juror, who had also been charged with a crime, was seated on the panel. *Keeton v. State*, 749 S.W.2d 861, 866 (Tex.Crim.App. 1988) (*Keeton II*).

■ The State responds first that appellant has failed to provide an adequate record to review his *Batson*[1] challenges because he has failed to provide a racial breakdown of the final jury panel and the original venire, along with his racial breakdown of the complained-of strikes. *Barron v. State*, 864 S.W.2d 189, 191 (Tex.App.—Texarkana 1993, no pet.); *Kizart v. State*, 811 S.W.2d 137, 140 (Tex.App.—Dallas 1991, no pet.). The record in the instant case reflects only the race of the venirepersons who were targets of the peremptory challenges and that two minority venirepersons were seated on the jury. Accordingly, the State maintains appellant has failed to present this court with an adequate record, and he has, thus, waived his *Batson* points. We agree. Besides the omissions listed by the State, we note that, although we know two minority venirepersons were seated on the panel, we do not have the particular racial composition of the final jury panel, nor do we have a complete racial breakdown of the strikes of both parties. We hold that appellant has not presented a sufficient record to demonstrate error. Tex.R.App.P. 50; *Barron*, 864 S.W.2d at 191. Nevertheless, we address the merits of appellant's first two points in the interest of justice.

■ In reviewing the trial court's findings on a *Batson* objection, an appellate court applies the "clearly erroneous" standard of review. *Tennard v. State*, 802 S.W.2d 678, 680 (Tex.Crim.App.1990), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991). The role of the reviewing court is not to determine whether the prosecutor's explanations are credible, but rather whether the trial court's ruling on the *Batson* objection is supported by the record and therefore not clearly erroneous. *Whitsey v. State*, 796

S.W.2d 707, 726 (Tex.Crim.App.1989) (op. on reh'g). We review the evidence in the light most favorable to the trial court's ruling. *Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993). The trial court's finding will be disturbed only if the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Hughes v. State*, 850 S.W.2d 260, 267 (Tex.App.—Fort Worth 1993, pet. ref'd).

■ When facially race-neutral explanations are offered, as in this case, the defendant has the burden to persuade the trial court that the challenge is racially motivated in fact. *Lewis v. State*, 815 S.W.2d 560, 563–64 (Tex.Crim.App.1991), *cert. denied*, 503 U.S. 920, 112 S.Ct. 1296, 117 L.Ed.2d 519 (1992). In other words, he must rebut the race-neutral explanations by a preponderance of the evidence, *Chambers v. State*, 866 S.W.2d 9, 24 n. 16 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1993), and affirmatively prove that the State's race-neutral explanations were a sham or pretext. *Webb v. State*, 840 S.W.2d 543, 544 (Tex.App.—Dallas 1992, no pet.). That burden is not met by the defendant merely disagreeing with the State's explanations. *Id.*

■ We conclude that appellant failed to meet his burden to rebut the State's explanations by a preponderance of the evidence. Appellant has never acknowledged or addressed one of the bases for the strikes of the two veniremen, that is, that they appeared "disinterested." The trial court corroborated this ground when she specifically stated that her observations of the conduct and demeanor of Cloud and Sanders supported the State's statements. Further, the State had a right to strike Cloud on the basis of his original statements, and his "backtracking" or later clarification did not affect that right. *See Vargas v. State*, 838 S.W.2d 552, 555 (Tex.Crim.App.1992).

■ As to Sanders, it was unnecessary to further question him about his arrest for fleeing from the police because it was obvious

---

1. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

that a previous criminal charge, in some ways similar to what the State hoped to prove in this case, was an unfavorable trait for the State. *Chambers*, 866 S.W.2d at 24–25. Regarding the prosecutor's hope to prove appellant's attempted flight, the record reflects the arresting officer said appellant appeared to be "peeking around" from behind a car. The court excluded the officer's opinion that appellant was hiding to avoid apprehension, but the record shows the prosecutor, at the time of voir dire, had the basis for hoping to prove that appellant attempted flight from the scene of his arrest.

■ In response to appellant's argument of disparate treatment because other (white) jurors with arrest records were not struck, the State points out that those venirepersons had strong compensating characteristics which favored the prosecution. Specifically, Ms. Brooks, venireperson number twenty-nine, who had two previous DWI convictions, and Ms. Smith, venireperson thirty-eight, who indicated she or a close friend or family member had been convicted of auto theft, both indicated they had recently been the victims of crime. Ms. Brooks indicated she had been recently robbed or burglarized in her home, and Ms. Smith indicated that her husband had been murdered. Additionally, it is not necessarily disparate treatment when one of the State's reasons for striking one venireperson would also technically apply to another venireperson that the State did not strike. *Cantu*, 842 S.W.2d at 689.

For all of the foregoing reasons, we hold that the trial court's finding that the State had no racist intent in striking the veniremen at issue was supported by the record; hence, it was not clearly erroneous. *Whitsey*, 796 S.W.2d at 726. Appellant's first and second points of error are overruled.

## POINT OF ERROR THREE

In his third point of error, appellant contends that the trial court improperly denied his requested instruction on the justification defense of necessity at the guilt-innocence stage of the trial. The only evidence appellant relies on to raise this instruction was his own statement given to police on April 24,

1991. The relevant portions of that statement are:

We got in the cab. I sat in the back on the passenger side. Joe sat on the driver's side in the back. After we started Joe said he wanted to stop by a friends' [sic] house and showed the cab driver where to go. The cab driver went down some back streets. Then Joe told him to stop by some railroad tracks where the street curved. I was looking at the houses trying to figure out who he knew. Then I heard a gunshot. Joe had shot the cab driver in the head. The cab drivers' [sic] head leaned forward a little bit. Then Joe got out and opened the drivers' [sic] door and pushed the cab driver over. He drove about a block or so. Joe was just laughing. *I didn't say anything because I did not want to get shot.* Joe stopped and went through the cab driver's pockets. Joe took some money out of the cab driver's pockets and took his wallet and car keys and watch. Then Joe opened the trunk and took the fire extinguisher. Joe threw the keys over toward the railroad tracks in the bushes. He put the fire extinguisher under his coat and started running down the railroad tracks. I ran the other way down the railroad tracks. I checked the cab drivers' [sic] coat pocket on the passenger side but he did not have any money in that pocket. [Emphasis added.]

Appellant maintains his statement provides evidence that he did not know the murder or robbery was going to occur until it did and that appellant thought he would be shot if he crossed Fernandez. Appellant argues that in light of what was "hardly an unreasonable assumption," any action he took in furtherance of the robbery and in cooperation with Fernandez might be found to be directed at avoiding the imminent harm of being shot. Appellant reasons that "[s]ince Mr. Dingman had already been shot, the harm to be avoided by the appellant in cooperating with Fernandez and going through the victim's pockets was less than the harm to be avoided, being shot."

■ A defensive jury issue must be submitted when some evidence is offered to sup-

port the issue, regardless of how strong or weak the evidence may be, *Warren v. State,* 565 S.W.2d 931, 933–34 (Tex.Crim.App. [Panel Op.] 1978), and an accused is entitled to have multiple defensive issues submitted even when they give rise to inconsistent defenses. *Booth v. State,* 679 S.W.2d 498, 501 (Tex.Crim.App.1984). Appellant argues duress and necessity were raised by the same evidence and were therefore available to him. Appellant says that although he had the burden of proof by a preponderance of the evidence in raising the affirmative defense of duress, *see* TEX.PENAL CODE ANN. §§ 8.05, 2.04 (Vernon 1994), the justification of necessity placed upon him no burden of proof. *See* TEX.PENAL CODE ANN. §§ 9.22, 9.02, 2.03 (Vernon 1994). Therefore, he concludes he was harmed under *Holman v. State,* 730 S.W.2d 881, 883–84 (Tex.App.—Fort Worth 1987, no pet.) because no other part of the jury charge gave him substantially the same or greater rights.

The State responds that appellant's argument fails for two reasons. First, the State claims appellant was not entitled to an instruction on necessity because the Legislature did not intend to allow the affirmative defense of duress to be made a nullity by recasting a duress defense as a necessity justification. Second, the State asserts that appellant's police statement never raised the issue of necessity.

The statute providing for the necessity defense reads:

> Conduct is justified if:
>
> (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;
>
> (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and
>
> (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise appear.

*See* TEX.PENAL CODE ANN. § 9.22 (Vernon 1994). The last element is a question for the Court. *Williams v. State,* 630 S.W.2d 640, 643 (Tex.Crim.App.1982).

■ On the other hand, when a defendant produces evidence to prove that he committed a felony because he was compelled to do so by the threat of imminent death or serious bodily injury to himself or another, he must prove the affirmative defense of duress. TEX.PENAL CODE ANN. § 8.05(a) (Vernon 1994).[2]

The State argues that appellant was trying to recast the duress instruction he had already received when he requested an instruction on necessity and that, if granted, appellant would have been able to circumvent the higher burden of proof required of him by the Legislature to show duress. It notes that the Dallas Court of Appeals has addressed claims similar to appellant's. That court concluded in a murder case that necessity was excluded as a possible justification under section 9.22(3) when self-defense becomes the "immediately necessary" conduct under section 9.22(1) because:

> [O]f the legislative purpose appearing in subparagraph (2) of article 9.32 respecting the use of deadly force in defense of the person. Any other result would circumvent the "retreat" requirement of Article 9.32 and thus thwart the legislative purpose to impose a higher standard where the use of deadly force is sought to be justified.

*Butler v. State,* 663 S.W.2d 492, 496 (Tex. App.—Dallas 1983), *aff'd on other grounds,* 736 S.W.2d 668 (Tex.Crim.App.1987). In *Epley v. State,* 704 S.W.2d 502, 506 (Tex.App.— Dallas 1986, pet. ref'd) the Dallas court declined to overrule *Butler.*

■ In our case, appellant cites no evidence raising necessity other than that relied on to raise duress. Appellant maintains that his police statement shows that he thought he would be shot if he crossed Fernandez and that any action he took thereafter in furtherance of the robbery, a felony,

---

**2.** Section 8.05(b) makes it clear that subsection (a) applies when the accused is charged with a felony, because subsection (b) states that compulsion due to force or threat of force is an affirmative defense "in a prosecution for an offense *that does not constitute a felony.*" TEX.PENAL CODE ANN. § 8.05(b) (Vernon 1994) (emphasis added).

could have been to avoid being shot. We agree with the State that the Legislature has plainly expressed its intent that this scenario raises the affirmative defense of duress. TEX.PENAL CODE ANN. § 8.05(a) (Vernon 1994). To allow appellant to use the necessity defense when the same evidence requires him to prove the elements of the affirmative defense of duress would render section 8.05(a) meaningless. Courts must presume all parts of a statute were meant to have some effect. *See* TEX.GOV'T CODE ANN. § 311.021 (Vernon 1988); *Ex parte Crouch*, 838 S.W.2d 252, 254 (Tex.Crim.App.1992).

We hold that, under the facts of this case, the necessity defense is excluded under subsection (3) of section 9.22 because of the legislative purpose expressed in section 8.05(a) to require a higher burden of proof to show duress as a defense in a felony prosecution.

■ In the alternative, we also agree with the State's second argument that appellant's police statement never raised the issue of necessity. Initially, the State notes that appellant never quotes which portion of his statement he relies on to raise the necessity defense. The State asserts that when appellant stated that he "didn't say anything because I didn't want to get shot," appellant did not admit a criminal act. Conversely, when appellant did admit a criminal act in his statement by checking "the cab driver's coat pocket on the passenger side," the State points out that appellant does not claim he did the act out of fear of "imminent harm" or that the act was "immediately necessary" as required under section 9.22 of the Penal Code and, in fact, the statement seemed to indicate appellant searched the victim's pockets after Fernandez left the area.

■ Appellant stated in oral argument that the State's interpretation of appellant's police statement as indicating his search of the driver's pocket was later in time was incorrect when you consider the statement as a whole because it shows appellant was afraid of Fernandez, who still had a gun. We conclude the statement is at least ambiguous regarding when in the sequence of events appellant searched the driver's pocket. To merit inclusion of a defensive instruction, the "defensive theory must be clearly and independently raised by the evidence in an affirmative manner." *Murray v. State*, 861 S.W.2d 47, 54 (Tex.App.—Texarkana 1993, pet. ref'd).

■ Further, there is no evidence in the statement that Fernandez threatened appellant in any way, ordered him to participate in the robbery, or even wanted him to do so. We conclude that appellant's arguments are based on speculation and conjecture. On appeal, speculation does not satisfy appellant's burden to produce evidence raising the instruction at trial. *See Leach v. State*, 726 S.W.2d 598, 600 (Tex.App.—Houston [14th Dist.] 1987, no pet.); *Rodda v. State*, 745 S.W.2d 415, 417 (Tex.App.—Houston [14th Dist.] 1988, pet. ref'd) (speculation will not raise necessity defense). Appellant's third point of error is overruled.

## POINT OF ERROR FOUR

■ Finally, appellant complains the trial court erroneously refused to charge on voluntariness as he requested. Conduct must be voluntary in order for it to be criminal. *See* TEX.PENAL CODE ANN. § 6.01 (Vernon 1994). Appellant argues that he was entitled to all defensive issues raised by the evidence and that the evidence that raised the defensive issues of duress and necessity also raised the question of whether his conduct was voluntary. He contends that once voluntariness is raised and requested, he was entitled to a charge on it. *Garcia v. State*, 605 S.W.2d 565 (Tex.Crim.App. [Panel Op.] 1980); *Whitehead v. State*, 696 S.W.2d 221 (Tex.App.—San Antonio 1985, pet. ref'd).

■ The State responds that appellant is not arguing his actions were literally involuntary, but instead is alleging he was coerced into participating in the robbery. It argues that the Court of Criminal Appeals in *Alford v. State*, 866 S.W.2d 619 (Tex.Crim.App.1993) held that the term "voluntary" does not relate to a mental state, as appellant argues:

We hold that the term "voluntarily" as utilized in section 6.01(a) means the ab-

sence of an accidental act, omission or possession.

*Id.* at 624.

We agree with the State. There is no evidence in our record raising the issue of whether appellant's participation in the robbery was other than "voluntary" as that term is defined in *Alford.* Appellant's fourth point of error is overruled.

The trial court's judgment is affirmed.