In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-06-00053-CR


______________________________




MICHAEL WESLEY SEARCY, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 276th Judicial District Court


Marion County, Texas


Trial Court No. F13648




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Carter



O P I N I O N



 A Marion County jury found Michael Wesley Searcy guilty of the murder of Kenneth Foster
and assessed punishment at sixty years' imprisonment. On appeal, Searcy raises three points of error. 
We affirm.

I. FACTUAL BACKGROUND

 An ongoing feud (1) between Searcy and Foster culminated in a confrontation October 11, 2005. 
In Smithland, there is a tree between a local convenience store and a trailer park under which friends
and neighbors gather and play dominoes. Earlier in the day, Foster had been playing dominoes with
friends under that tree. Searcy, who lived in a trailer up the road, had come down to this area to talk
with one of the residents about doing some bush-hogging work for Searcy, then Searcy returned to
his house and continued to do yard work. Hot and thirsty from the work, he returned to the
convenience store and social hub, the Pic-N-Pay, to buy some beer. This time he brought a gun. 

 Although Searcy claims to have been trying to keep a low profile and avoid Foster, Searcy
found himself in the trailer park and in a verbal confrontation with Foster during this second trip to
the store and gathering-spot. Witnesses testified that Searcy drew at least one line in the dirt and,
as the apparently weaponless Foster approached that line, Searcy pulled a gun and began to fire at
Foster. Foster ran, and Searcy chased after him and caught up to Foster, firing one last shot to the
back of Foster's head. 

 Searcy lingered only long enough to empty the spent casings and say something to the effect
that now he had a reason to go to jail. Searcy then stated, "F*** all y'all," and fled the scene. Foster
sustained three gunshot wounds, all consistent with eyewitness accounts that he was running away
from Searcy. Although Searcy admitted shooting Foster, he would later testify at trial that Foster had
struck him with one hand and wielded a knife in the other; none of the several eyewitnesses testified
so, and no one recovered a knife from the scene. 

II. REFUSAL OF REQUESTED CHARGE ON NECESSITY

 The trial court refused to include the defense of necessity in the jury charge, but did charge
the jury on self-defense using deadly force. (2) On appeal, Searcy complains that the trial court erred
by not including a charge on necessity in addition to self-defense: "Appellant further urges that the
[trial] court's instruction to the jury on self-defense does not preclude a charge on the law of
necessity." Under the law of self-defense applicable here, he is incorrect. (3)

 Under Section 9.22 of the Texas Penal Code, conduct is justified, under necessity, if:

 (1) the actor reasonably believes the conduct is immediately necessary to
avoid imminent harm;


 (2) the desirability and urgency of avoiding the harm clearly outweigh,
according to ordinary standards of reasonableness, the harm sought to be prevented
by the law proscribing the conduct; and


 (3) a legislative purpose to exclude the justification claimed for the conduct
does not otherwise plainly appear.

Tex. Penal Code Ann. § 9.22 (Vernon 2003). In determining whether a trial court should include
both necessity and self-defense in its charge to the jury, Texas courts have concentrated on
subsection (3) as it relates to the justification of self-defense using deadly force. Specifically, courts
have looked at Section 9.22(3) and the duty to retreat found in Section 9.32(a)(2). Tex. Penal Code
Ann. §§ 9.22(3), 9.32(a)(2) (Vernon 2003).

 The Dallas court specifically addressed the issue of including both justifications in Butler v.
State, 663 S.W.2d 492, 496 (Tex. App.--Dallas 1983), aff'd on other grounds, 736 S.W.2d 668
(Tex. Crim. App. 1987). The Butler court focused on the legislative purpose of the duty to retreat
before using deadly force found in Section 9.32(a)(2). Id. Since it plainly appeared that the
Legislature imposed this duty before one used deadly force, necessity was excluded as a possible
justification under Section 9.22(3). See id. As the Butler court explains: "Any other result would 


circumvent the 'retreat' requirement of Article 9.32 and thus thwart the legislative purpose to impose 


a higher standard where the use of deadly force is sought to be justified." Id. In other words, when
self-defense using deadly force becomes the "immediately necessary" conduct urged under Section
9.22(3), necessity is excluded as a justification. (4)

 The Fort Worth court treated the issue slightly differently in Banks v. State, 955 S.W.2d 116 
(Tex. App.--Fort Worth 1997, no pet.). Reviewing a murder conviction in which a defendant shot
his girlfriend in the head as the couple sat in a car, the Fort Worth court concluded that the trial court
did not err by refusing to instruct the jury on self-defense and defense of a third person when the trial
court instructed the jury on necessity. See id. at 118-19. The defendant had maintained that he shot
his girlfriend accidentally as he shot at a stranger who had approached the passenger window. Id.
at 117. Banks suggests that, in cases where both justifications are raised, inclusion of one precludes
inclusion of the other. See id. at 119. That is, if the jury is charged on necessity, self-defense is
inapplicable, even though the defendant would necessarily be held to a lesser standard in proving
necessity as a justification:

 Thus, when self defense is submitted in the jury charge, the defense of necessity
cannot be submitted. Use of the necessity defense together with self-defense would
thwart the legislative purpose to impose a higher standard and circumvent the
"retreat" requirement of section 9.32 where the use of deadly force is sought to be
justified. Id. In the present case, the court, having submitted the defensive charge
of necessity, was precluded from submitting a charge on self-defense. The benefit
received by appellant was that he was not bound by the retreat requirement.

Id. So, the Banks opinion treated this issue as an either/or situation, in contrast to the Butler
approach that seemingly excludes necessity as a justification when deadly force is at issue.

 This Court has recognized the Butler rule in a slightly different context. Gonzales v. State,
2 S.W.3d 600, 606 (Tex. App.--Texarkana 1999, pet. ref'd). In concluding that an appellant was
not harmed by the trial court's refusal to permit defense counsel to question the jury panel on the
defense of necessity, this Court wrote:

 There is authority holding that in murder cases in which self-defense is raised, the
defense of necessity is inapplicable. Butler. . . stated that the law of necessity and the
law of self-defense do not overlap, holding that [Section] 9.22 was rendered
inapplicable when self-defense is the "immediately necessary" conduct. See Banks
v. State, 955 S.W.2d 116, 118-19 (Tex. App.--Fort Worth 1997, no pet.).


Id. Searcy relies on another opinion from this Court in which we held that a defendant convicted of
murder was entitled to a defense on necessity. See Hubbard v. State, 133 S.W.3d 797, 803 (Tex.
App.--Texarkana 2004, pet. ref'd). Hubbard, an inmate, got into a physical altercation with his cell
mate, Townsel, after Hubbard awoke to Townsel on top of him and attempting to rape him. Id. at
798. Ultimately, Townsel died from an infection that developed from the broken sternum and
broken ribs he suffered in the fight. Id. Hubbard was denied a jury instruction on necessity and was
convicted of murder. Id. We concluded that, on those particular facts, Hubbard was entitled to an
instruction on necessity. Id. at 803.

 It is important to note that Hubbard did not request a necessity instruction in addition to a
self-defense instruction, distinguishing Hubbard from the instant case. Further, although Townsel
did ultimately die from an infection caused by injuries sustained in the fight, it does not appear that
Hubbard faced any deadly force from Townsel's actions and, therefore, Hubbard was not entitled to
use deadly force in his defense. Consequently, the duty to retreat was not at issue. So, Hubbard can
be distinguished from the instant case as can another case on which Searcy relies, Withers v. State,
994 S.W.2d 742 (Tex. App.--Corpus Christi 1999, pet. ref'd). The Withers court held that the
defendant was entitled to an instruction on the issue of necessity as well as instructions on
self-defense and defense of a third person. Id. at 746. However, deadly force and the retreat duty
were not at issue in Withers either, therefore making that case distinguishable from the case at bar. 

 Here, the trial court instructed the jury on self-defense using deadly force, which included
a duty to retreat. Searcy wanted both self-defense and necessity. We conclude that the inclusion of
the justification of necessity, on facts such as these which clearly implicate the application of self-defense using deadly force, would undermine the Legislature's purpose in imposing the duty to
retreat. We overrule Searcy's point of error.

III. ADMISSION OF STATEMENT IN POST-WARNING PORTION OF VIDEOTAPE

 A. The Videotape and the Deputy's Statement

 When law enforcement learned the identity and location of Searcy, Deputies Stephen Thomas
and Jerry Bruce drove to Searcy's residence. Searcy voluntarily left his house to speak with the
deputies. This interaction was recorded by the in-car video recorder. (5) Searcy was handcuffed out
of safety concerns, and Deputy Thomas began asking him identifying information and then started
asking about the location of the gun. After Searcy had already made several statements, Deputy
Bruce brought Searcy to the vehicle and began reading Searcy his rights. Just as Deputy Bruce was
beginning to give those warnings, a dispatch came in to the deputies reminding them to give those
warnings. Part of that dispatch call occurred while Bruce was giving Searcy warnings and makes
intermittent portions of the warnings inaudible. 

 At trial, Searcy objected to the admission of any of the recording based on violations of
Article 38.22. He argued that the first portion of the recording contained oral statements in response
to custodial interrogation and did not comply with the warning requirement of Article 38.22. See
Tex. Code Crim. Proc. Ann. art. 38.22, § 3 (Vernon 2005). The trial court agreed as to the
prewarning portion of the videotape, but found the warnings administered by Bruce after Searcy was
taken to the car to be the fully effective equivalent of the warning required by Article 38.22 for the
admission of a recorded oral statement given in response to custodial interrogation. See Tex. Code
Crim. Proc. Ann. art. 38.22, §§ 2(a), 3(a)(2) (Vernon 2005). The trial court also found that,
although Searcy was not visible when asked if he understood his rights, other, verbal cues clearly
indicated that Searcy waived his rights. The trial court admitted the portion of the recording
following the warnings.

 Later in the proceeding when the State offered portions of the transcript of the pre-warning
statement, the trial court agreed with the State that testimony regarding certain remarks contained
in the pre-warning portion of the videotape had been elicited without objection. Indeed, defense
counsel even elicited testimony regarding the statements Searcy made to the deputies when they first
arrived at the residence. A partial transcript of the pre-warning portion of the recording was admitted
by agreement. This transcript included Searcy's initial account of the confrontation that included a
statement to the effect that he took a gun away from Foster.

 On appeal, Searcy contends the trial court erroneously admitted the post-warning portion of
the recording that refers to Searcy's earlier, inconsistent account on the pre-warning portion of the
videotape. He also argues that this portion of the recording was inadmissible because of the deputies'
failure to strictly comply with the requirements of Article 38.22. 

 B. Deputy's Statement as Reference to Subsequently Admitted Evidence

 It is important to note that the pre-warning portion of the videotape contains the majority of
Searcy's direct statements of the event. We reiterate that defense counsel agreed to the admission
of a partial transcript of the pre-warning portion that includes Searcy's initial versions of the
confrontation with Foster. We also point out that, in some respects, the applicability of Article 38.22
is tenuous here. That is, Searcy specifically complains of Thomas' statement in the post-warning
portion that refers to Searcy's earlier statements. Since it is Thomas' statement at issue rather than
Searcy's own statement and since the deputy's statement refers to evidence later admitted, we
question whether Article 38.22 is the most fitting analysis.

 We look at Thomas' statement that Searcy failed to mention a knife in his earlier accounts
as one that refers to evidence subsequently admitted by agreement. Evidence prematurely admitted
in error may become admissible or its admission rendered harmless when other evidence is
subsequently admitted. See James v. State, 102 S.W.3d 162, 175 (Tex. App.--Fort Worth 2003, pet.
ref'd). So, even assuming that Thomas' recorded statement somehow violated Article 38.22 by
referring to Searcy's pre-warning version of events, any error was rendered harmless when that pre-warning version of events was admitted by agreement. The jury heard Searcy's account that Foster
had a knife and then later heard Searcy's various other accounts of the confrontation that included
the assertions that Foster "jumped him" and that Searcy took the gun away from Foster. Those prior
versions made no mention of a knife. The jury, then, was able to observe, as did Thomas, that Foster
did not initially mention a knife in his depiction of the shooting. We conclude that Thomas'
statement on the videotape is one that refers to evidence subsequently admitted by agreement and,
therefore, there is no harmful error associated with admission of the statement. 

 C. Videotape as Impeachment

 The focus of Searcy's argument is that Thomas' statement on the recording refers to Searcy's
statements made before any Article 38.22 warnings were given and that, in doing so, puts before the
jury what Article 38.22 prohibits and what the trial court ruled as inadmissible: Searcy's pre-warning
statements.

 We can uphold the trial court's ruling on the admitted portion of the videotape containing
Thomas' statement if correct under any theory applicable to the case. Sauceda v. State, 129 S.W.3d
116, 120 (Tex. Crim. App. 2004). With that in mind, we also note that, in addition to the several
warnings Article 38.22 requires, (6) it also provides for admission of oral statements that do not
necessarily comply with those requirements for, among other purposes, impeachment of a testifying
defendant:

 Nothing in this article precludes the admission of a statement made by the accused
in open court at his trial, before a grand jury, or at an examining trial in compliance
with Articles 16.03 and 16.04 of this code, or of a statement that is the res gestae of
the arrest or of the offense, or of a statement that does not stem from custodial
interrogation, or of a voluntary statement, whether or not the result of custodial
interrogation, that has a bearing upon the credibility of the accused as a witness, or
of any other statement that may be admissible under law.

Tex. Code Crim. Proc. Ann. art. 38.22, § 5 (Vernon 2005).

 In the post-warning portion of the videotape, Searcy added that Foster had a knife in one
hand, a statement to which Searcy testified several times. That said, under Article 38.22, the State
could use the videotape, regardless of the timing of the warnings, to impeach Searcy on this issue. 
Put another way, regardless of the agreement to admit the transcript of the relevant portion of the
pre-warning portion of the recording, Searcy's recorded statements were likely admissible as
impeachment. And the deputy's statement that Searcy had not earlier mentioned a knife would be
the very point that the State would make as it pointed out the many ways in which the recorded
statements were inconsistent with Searcy's trial testimony that Foster wielded a knife. Again, the
jury would be able to note the inconsistencies, making the deputy's observation an obvious one and
rendering harmless any error associated with the deputy's statement. We overrule Searcy's point of
error. 

IV. JURY ARGUMENT: COMMENT ON FAILURE TO TESTIFY

 A. State's Argument and Defense Counsel's Objection

 Searcy testified at the guilt/innocence phase of trial, but did not testify at the punishment
phase of trial. During its jury argument at the punishment phase, the State argued on the topic of
remorse:

 [The State]: And his parting remark to the dead Mr. Foster was, "They
already hauled that M.F. off already?" Well, I heard a lot of "F" words, but there's
two words I never heard. I didn't hear it when he was testifying on direct, and I never
heard it in the punishment hearing. Two simple words.


 [Defense Counsel]: Your Honor, I'd object to the argument as a comment
on the failure - Defendant's failure to testify at the punishment hearing.


The trial court then immediately sent the jury out of the courtroom, after which the trial court had
the court reporter read back the relevant portion of the State's argument. The trial court sustained
defense counsel's objection:

 I'm going to sustain the objection and instruct the jury to disregard the comment. I
want to clarify however. I'm making this ruling based upon only the comment that
you made where "I didn't hear it in the punishment hearing." I'm not saying that I am
disallowing you to go back and restate to the jury[,] if you desire[,] that you didn't
hear it while he was testifying on direct and that you didn't hear it on the tape.


Defense counsel moved for a mistrial, and the trial court denied that motion. The trial court then
brought the jury back into the courtroom.

 B. Trial Court's Instruction to Jury

 The trial court instructed the jury as follows:

 Immediately before I sent you to the jury room, there had been an objection to some
argument made by [the State]. I am sustaining that objection and I am instructing the
jury to totally disregard and not consider for any purpose the argument that had been
made by [the State] immediately preceding the objection being made.


Defense counsel again unsuccessfully moved for a mistrial. The State continued its argument to the
jury, tailoring it to the trial court's ruling. (7) On appeal, Searcy contends that the trial court abused its
discretion by denying his motion for mistrial based on the State's original argument.

 C. Applicable Law: Comment on Defendant's Failure to Testify

 The failure of a defendant to testify on his or her own behalf in a criminal trial may not be
taken as a circumstance against the defendant, and neither counsel may allude to or comment on such
a refusal. Tex. Code Crim. Proc. Ann. art. 38.08 (Vernon 2005); Pina v. State, 38 S.W.3d 730,
740 (Tex. App.--Texarkana 2001, pet. ref'd). A comment on a defendant's failure to testify violates
both Federal and State Constitutions and a mandatory state statute. See Fontaine v. California, 390
U.S. 593 (1968); Bustamante v. State, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001); Tex. Code
Crim. Proc. Ann. art. 38.08.

 Recently, the Texas Court of Criminal Appeals has addressed this issue and has emphasized
the position that, in this procedural posture, reviewing courts must focus their analysis on whether
a trial court abused its discretion when it denied a motion for mistrial based on a prosecutor's
improper jury argument. See Archie v. State, 221 S.W.3d 695 (Tex. Crim. App. 2007).

 To determine whether improper jury argument warrants a mistrial and whether a trial court
abused its discretion when it denied the motion for mistrial, we balance three factors:

 1) severity of the misconduct (the magnitude of the prejudicial effect of the
prosecutor's remarks);


 2) measures adopted to cure the misconduct (the efficacy of any cautionary
instruction by the judge); and


 3) the certainty of conviction absent the misconduct (the strength of the evidence
supporting the conviction).


Id. at 700 (citing Ramon v. State, 159 S.W.3d 927, 929 (Tex. Crim. App. 2004); Mosley v. State, 983
S.W.2d 249 (Tex. Crim. App. 1998)). The Archie court pointed out that, when the alleged improper
argument occurred at the punishment phase--as it did in both Archie and the instant case--the third
factor involves an analysis of the certainty of the punishment assessed. Id.; Martinez v. State, 17
S.W.3d 677, 693 (Tex. Crim. App. 2000).


 1. Severity of the misconduct

 Initially, we observe that defense counsel objected to the argument before the State finished
its argument. So, although it is likely that the jury anticipated what the two simple words of remorse
were, the argument is incomplete. Further, it might also be noteworthy that the State makes the
distinction between what Searcy did not say during his testimony and what the jury did not hear in
punishment. See Thomas v. State, 638 S.W.2d 481, 482 (Tex. Crim. App. 1982). Calling attention
to the absence of evidence which only the defendant could produce will result in reversal only if the
remark can only be construed to refer to the defendant's failure to testify and not the defense's failure
to produce evidence. See Fuentes v. State, 991 S.W.2d 267, 275 (Tex. Crim. App. 1999). When
there is evidence in the record indicating a lack of remorse, a comment on the defendant's lack of
remorse does not naturally and necessarily lead the jury to understand it to be a comment on the
defendant's failure to testify. See Howard v. State, 153 S.W.3d 382, 385 (Tex. Crim. App. 2004);
Caldwell v. State, 818 S.W.2d 790, 800-01 (Tex. Crim. App. 1991).

 Here, in much the same way as the Caldwell court did, we look at Searcy's reluctance to help
locate the gun and his several expressions of concern for his own safety immediately after the
shooting. (8) The jury heard evidence from A. J. McDonald, a witness, that, shortly before Searcy fled
the scene, Searcy emptied the shell casings into his hand and stated, "Now I got a reason to go to
jail." Further, the jury had before it Searcy's 9-1-1 call (9) and the videotape. The record contains some
evidence indicating a lack of remorse, therefore enabling the jury to interpret the State's truncated
statement as argument other than that which implicated the fact of Searcy's failure to testify at
punishment. For that reason, we conclude that any misconduct, here, was minimal.

 2. Curative measures

 Whether a curative instruction is effective depends on the facts of each case. Swallow v.
State, 829 S.W.2d 223, 227 (Tex. Crim. App. 1992); Hardin v. State, 20 S.W.3d 84, 93 (Tex.
App.--Texarkana 2000, pet. ref'd). The question is essentially one of balancing the magnitude of
the probable effect of the question on the jury against the probable efficacy of an instruction to
disregard. (10) Hardin, 20 S.W.3d at 93. The greater the magnitude of effect, the less likely it is that
an instruction would cure the harm. See id.; see also Dinkins v. State, 894 S.W.2d 330, 357 (Tex.
Crim. App. 1995) (explaining that only in the most blatant examples will the courts apply the
presumption that an instruction to disregard generally will not cure comment on failure to testify).

 We first note that the trial court promptly removed the jury from the courtroom and promptly
requested the court reporter read the precise language, and delivered a careful, tailored ruling on
defense counsel's objection. When the jury returned, the trial court directed the jury to disregard the
comment immediately preceding the objection. While it could be said that the instruction would
have been more effective by specifying the argument at issue, we observe that the trial court's
instruction minimized the impact of the argument by not repeating it to the jury; the trial court's
repetition may have only compounded any effect of the argument and made it more difficult for the
jury to disregard. We also consider that the State carefully complied with the trial court's ruling
when the State continued its argument.

 3. Certainty of punishment

 The evidence showed that Searcy shot the fleeing Foster several times and contradicts
Searcy's assertion of self-defense. The jury learned of Searcy's several prior convictions and past
acts of violence, evidence that would support a sixty-year sentence. See Archie, 221 S.W.3d at 700.

 Considering the ambiguous argument, the trial court's prompt instruction, the State's
compliance with the ruling, and the state of the evidence supporting the sixty-year sentence, we
conclude that the trial court did not abuse its discretion by denying Searcy's motion for mistrial and
overrule his final point of error.



 Having overruled Searcy's points of error, we affirm the trial court's judgment.


 Jack Carter

 Justice


Date Submitted: June 21, 2007

Date Decided: August 15, 2007


Publish
1. There is evidence that Searcy owed Foster money after Searcy destroyed the shotgun Foster
had pulled on Searcy seven months before this incident and that Anna Whitaker had lived with
Searcy, then dated Foster, then returned to live with Searcy. There is also evidence that Searcy owed
Foster for drugs. 
2. When we review a jury charge for error, we first determine whether the alleged error was
preserved. If so, any harm, regardless of the degree, is sufficient to require reversal of the
conviction. See Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). Here,
Searcy properly preserved error.
3. We recognize that, effective September 1, 2007, "[a] person who has a right to be present
at the location where the deadly force is used, who has not provoked the person against whom the
deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used"
will  not  be  required  to  retreat  before  using  deadly  force.  Act  of  March  20,  2007,  80th  Leg.,
R.S., ch. 1, § 3(c), 2007 Tex. Sess. Law Serv. 1, 2 (to be codified at Tex. Penal Code § 9.32).
4. The Dallas court reaffirmed its position: "On authority of Butler, we hold that the court did
not err in failing to instruct on necessity." Epley v. State, 704 S.W.2d 502, 506 (Tex. App.--Dallas
1986, pet. ref'd); see also Hermosillo v. State, 903 S.W.2d 60, 68 (Tex. App.--Fort Worth 1995, pet.
ref'd).
5. At the very beginning of the recording, there was no audio. After the microphone began
recording, the videotape shows that Searcy's answers were often nonresponsive to the deputies'
questions regarding the location of the gun and that Searcy's answers went instead to the details of
the argument between him and Foster. 
6. Article 38.22 requires the following warnings to be made: 


 (1) he has the right to remain silent and not make any statement at all and that
any statement he makes may be used against him at his trial; 

 (2) any statement he makes may be used as evidence against him in court; 

 (3) he has the right to have a lawyer present to advise him prior to and during
any questioning; 

 (4) if he is unable to employ a lawyer, he has the right to have a lawyer
appointed to advise him prior to and during any questioning; and 

 (5) he has the right to terminate the interview at any time. 


Tex. Code Crim. Proc. Ann. art. 38.22, § 2(a). Article 38.22 also requires that the "the accused
knowingly, intelligently, and voluntarily waive[] any rights set out in the warning." Tex. Code
Crim. Proc. Ann. art. 38.22, § 3(a)(2). In the videotape, Deputy Bruce can be heard issuing the
following warnings interrupted by the dispatch call to Deputy Thomas:


 You have the right to have . . . prior to any questioning

 If you are unable to employ a lawyer, you have the right to have one appointed . . .
prior to and during any questioning

 You have the right to remain silent and not make any statement at all

 . . . will be used against you . . . .

 You have the right to terminate any interview at any time.


When Deputy Bruce asked if Searcy understood this, Searcy softly replied in the affirmative. The
deputy responded "O.K.," and then Searcy nearly immediately continued with a disjointed account
of how Foster swung at him with one hand and added that Foster had a knife in the other hand. The
trial court found the warnings to be a fully effective equivalent as permitted by Article 38.22, Section
3(e)(2)  of  the   Texas  Code  of  Criminal  Procedure.  See  Tex.  Code  Crim.  Proc.  Ann.  art.
38.22, § 3(e)(2); Buckley v. State, 46 S.W.3d 333, 337 (Tex. App.--Texarkana 2001, pet. dism'd,
untimely filed).
7. Specifically, the State continued as follows:


 As I was saying, you heard a lot of "f" words and a lot of cussing and a lot of
aggressive talk by Mr. Searcy on those tapes, both the video and the audio tapes. As
I was also saying, you heard a lot of those words, but I never heard two words while
Mr. Searcy was testifying. And I never heard those two words from any of the
witnesses who testified in Mr. Searcy's case. They're very simple words. They're
words of remorse. It's "I'm sorry." And you can say that even if you killed someone
that you think is trying to harm you, because taking a human life is serious. And I
never heard those words. 


Although there may be some concern as to the State's argument as it relates to the failure of Searcy's
witnesses to testify about his remorse, Searcy made no objection to the argument as modified.
8. (Paraphrasing: I'm worried I'm going to get shot through this police car; "I sh** you not,"
I was trying to get away from there), his failure to inquire as to the condition of Foster, and his
observation that they must have already hauled that "m.f." off as evidence of his lack of remorse. 
9. The act of calling 9-1-1 may be said to be some evidence that Searcy did feel remorse. We
do not have the audiotape of that call. It should be noted, too, that Anna Whitaker Gray testified that
Searcy was crying and saying that he had "f***ed up." So while there is evidence that Searcy did
not feel remorse, there is also evidence that could support the contrary.
10. The Waco court has evaluated the effectiveness of an instruction to disregard by weighing
the following factors: "the nature of the [improper comment]; the persistence of the prosecutor; the
flagrancy of the violation; the particular instruction given; the weight of the incriminating evidence;
and the harm to the accused as measured by the severity of the sentence." Roberson v. State, 100
S.W.3d 36, 41 (Tex. App.--Waco 2002, pet. ref'd); see Adams v. State, 156 S.W.3d 152, 157 (Tex.
App.--Beaumont 2005, no pet.).



rmal style='text-align:justify;text-justify:inter-ideograph;
line-height:200%;mso-pagination:widow-orphan'>            Luckett
appeals the trial courts judgment on the sole ground that the evidence
presented at the revocation hearing was insufficient to establish he was the
person responsible for actually filling out the check.  Although Luckett admits to having passed the
check that was the basis of the claims against him, he maintains that he did
not intend to commit fraud.  Because we
find the evidence sufficient by a preponderance of the evidence to establish
that Luckett possessed a forged check with intent to pass it, we affirm the
trial courts judgment. 

I.          Standard of Review 

            We review a decision to
adjudicate guilt in the same manner as we review a decision to revoke
community supervision.[2]  Tex.
Code Crim. Proc. Ann. art. 42.12, § 5(b) (Vernon Supp. 2009).  While the decision to revoke community
supervision rests within the discretion of the trial court, that discretion is
not absolute.  In re T.R.S., 115 S.W.3d 318, 320 (Tex. App.Texarkana 2003, no
pet.).  To revoke community supervision,
the State must prove by a preponderance of the evidence every element of at
least one ground for revocation.  Tex. Code Crim. Proc. Ann. art. 42.12,
§ 11 (Vernon Supp. 2009); T.R.S., 115
S.W.3d at 320; Johnson v. State, 943
S.W.2d 83, 85 (Tex. App.Houston [1st Dist.] 1997, no pet.).  Preponderance of the evidence has been
defined as the greater weight and degree of credible testimony.  T.R.S.,
115 S.W.3d at 320.  In other words, if
the greater weight of credible evidence in this case created a reasonable
belief that Luckett violated a condition of his community supervision, the
standard was met.  Id. at 321 (citing Martin v.
State, 623 S.W.2d 391, 393 n.5 (Tex. Crim. App. [Panel Op.] 1981)).  

            In
a revocation hearing, the trial court is the sole trier of the facts and
determines the credibility of the witnesses and the weight to be given to the
testimony.  Id. at 321; Lee v. State,
952 S.W.2d 894, 897 (Tex. App.Dallas 1997, no pet.); Johnson, 943 S.W.2d at 85. 
The judge may accept or reject any or all of a witnesss testimony.  T.R.S.,
115 S.W.3d at 321 (citing Mattias v.
State, 731 S.W.2d 936, 940 (Tex. Crim. App. 1987)).

            Considering
the unique nature of a revocation hearing and the trial courts broad
discretion in the proceedings, the general standards for reviewing factual
sufficiency do not apply.  Pierce v. State, 113 S.W.3d 431, 436
(Tex. App.Texarkana 2003, pet. refd). 
Instead, we review the trial courts decision regarding community
supervision revocation for an abuse of discretion and examine the evidence in a
light most favorable to the trial courts order.  T.R.S.,
115 S.W.3d at 321; Pierce, 113 S.W.3d
at 436 (citing Garrett v. State, 619
S.W.2d 172, 174 (Tex. Crim. App. 1981)). 
Thus, if the greater weight of credible evidence creates a reasonable
belief a defendant has violated a condition, the trial courts order of
revocation was not an abuse of discretion and must be upheld.  Pierce,
113 S.W.3d at 436 (citing Scamardo v.
State, 517 S.W.2d 293, 298 (Tex. Crim. App. 1974)).  

II.        Sufficient Evidence
Established Violation of Terms of Community Supervision 

            The
States first witness at the revocation hearing was Cecil Iglehart.  She testified her checkbook was taken from
her purse in the bedroom after Luckett and his girlfriend, Stephanie Cockraham,[3]
came to her home with her granddaughter and grandson, Stephanie and Trae.[4]  Her bank statement revealed that a $5,000.00
check had been forged by someone who had misspelled her first name (spelling it
Cecile).  The payee and endorser of
this check was Zack Luckett for a Vecicle. 
Upon discovery of the check in her bank statement, Iglehart went
personally to the bank upon which the check was drawn.  While there, Iglehart was shown a video of
the person who cashed the check, and Iglehart identified the person as Luckett.
 Wendy Knight acknowledged that she had
been the bank teller who had honoured the check after having had Luckett (whom
she recognized in court and identified) produce a drivers license and writing
the license number on the check.  The
bank produced a video recording of Luckett during the transaction at the bank. 

            Luckett
attempted to divert the focus onto Stephanie as a potential perpetrator of the
crime.  During Igleharts cross-examination,
Luckett confronted Iglehart with an out-of-court statement made by Trae.  In that statement, Trae alleged that
Stephanie took the check, delivered it to Luckett, and waited at the bank while
Luckett cashed it. The statement went on to say that when Luckett returned from
inside the bank, he gave Stephanie what appeared to be $1,500.00 cash, some of
which she shared with Trae, but she instructed Trae to say that the money came
from someone else.  Iglehart also
testified Stephanie was on community supervision for a forgery offense that she
had committed in Oklahoma.  

            However,
the totality of the evidence established that if Stephanie was involved, it was
in conspiracy with Luckett and Cockraham. 
Investigator James Mazy described an encounter with Luckett, during
which he wanted to come and basically tell his side of the story.  Lucketts story to Mazy began with Stephanies
alleged statement that she lost $5,000.00 in Idabel, Oklahoma, on some type of
car deal.  She planned on satisfying her
debt by obtaining a loan from her grandmother. 
Since Stephanie did not have her drivers license, she asked Luckett to
cash the check for her and gave him $500.00 from the proceeds as a check
cashing fee.  After obtaining different
stories from Cockraham, and denials from each of them that either of them had
been to Igleharts residence, Mazy concluded their version of events had no
basis of validity.  Mazy also stated
that his review of the bank video recording revealed that Luckett had tried to
hide his face when he realized that a camera was recording him.  

            After
Luckett and Cockraham were interviewed, Mazy instructed them to each write
three sample checks.  Luckett introduced
the handwriting samples during Mazys cross-examination.  Mazy admitted that because Cockrahams
handwriting was similar to that on the forgery and because it had the same
misspelling of Igleharts name, it was possible that Cockraham had signed the
forged check.  

            Finally,
Cockraham took the stand and claimed Stephanie said she was being
reimbursed for a $5,000.00 check that had been stolen from her.  Her grandmother was reimbursing her.  There was no mention of a car deal, which
Luckett used to explain the term Vecicle contained on the memo line of the
forged check.  Luckett also obtained
money from the cashed check. 

            Forgery
has several meanings, one of which is to possess a writing that is forged . . .
with intent to utter or pass it.  Tex. Penal Code Ann. § 32.21(a)(1)(C)
(Vernon Supp. 2009). Here, Iglehart did not
authorize the execution of the check. 
The fact that the check was executed by someone else was
uncontested.  Luckett possessed the
forged check with intention to pass it and obtain $5,000.00 cash.  The question becomes whether he possessed the
requisite intent to defraud or harm Iglehart. 
Tex. Penal Code Ann. §
32.21(b) (Vernon Supp. 2009).  

            Iglehart
claimed that Luckett and Cockraham came to her home and it was at that time
that her checkbook was stolen, a fact both denied vehemently.  Since the trial court was the sole trier of
the facts and credibility, it was free to believe Iglehart, who identified the
couple from a video recording at the bank and from a photographic lineup.  T.R.S., 115 S.W.3d at 321; Johnson,
943 S.W.2d at 85.  Mazy described
inconsistencies in the stories told to him by Luckett and Cockraham, further
evidencing guilt on their part. 
Cockrahams handwriting was similar to the writing on the forged check
and contained the same misspelling of Igleharts name.  The main defense theory was that Stephanie,
who was not located, was the person who actually forged the check.  The court was free to disbelieve that
Igleharts own granddaughter would misspell her name.  Taking into consideration that Luckett,
Cockraham, and Stephanie all received sums from the forged check, Traes
statement suggested that the trio conspired together to defraud Iglehart.  This evidence, coupled with observation of
bank video recordings and Mazys testimony that Luckett attempted to hide his
face after realizing he was being filmed, could have led the trial court to
conclude by a preponderance of the evidence that Luckett possessed the
requisite intent to defraud. 

            Thus,
since the greater weight of credible evidence reviewed in a light most
favorable to the ruling created a reasonable belief Luckett violated a
condition of his community supervision, we cannot conclude the trial court
abused its discretion in proceeding to adjudication of guilt and sentencing.  Pierce,
113 S.W.3d at 436 (citing Scamardo,
517 S.W.2d at 298).  

III.       Conclusion 

            We
affirm the judgment of the trial court.  

 

 

                                                                        Bailey
C. Moseley

                                                                        Justice

 

Date
Submitted:          March 11, 2010

Date
Decided:             March 12, 2010

 

Do Not
Publish











[1]Luckett
appeals from judgments entered in this cause and in cause number
06-09-00191-CR.  





[2]Thus,
all standards will be discussed in terms of revocation of community supervision.





[3]To
avoid confusion, further reference to Lucketts girlfriend will be as
Cockraham and references to Igleharts grandchildren, Stephanie Iglehart and
Trae Iglehart, will be by their first names.

 





[4]Iglehart
identified Luckett from the bank video recording and picked Cockraham out of a
photographic lineup as being the individuals who had visited her residence.